**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUNE E. ADAMS IRREVOCABLE TRUST DATED 7/21/14 FBO EDWARD ROBERT ADAMS, individually and on behalf of all others similarly situated, <br><br>             Plaintiff, <br>     vs. <br><br> INTERNATIONAL BUSINESS MACHINES CORPORATION, VIRGINIA M. ROMETTY, MARTIN J. SCHROETER, JAMES J. KAVANAUGH, ARVIND KRISHNA, BRIDGETTE VAN KRALINGEN, SHANKER RAMAMURTHY, PABLO SUAREZ, SARAH DIAMOND, ALISTAIR RENNIE, MARK ANDREWS, DON INDIA, CHRIS JOHNSTON, and MARK FOSTER <br><br>           Defendants. | Civil Action No.: <br><br> CLASS ACTION <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> DEMAND FOR JURY TRIAL |

Plaintiff June E. Adams Irrevocable Trust Dated 7/21/14 FBO Edward Robert Adams ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters based on the investigation conducted by and through its attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by International Business Machines Corporation ("IBM" or "Company"), Company press releases, media and reports about the Company, interviews with former employees, and other relevant litigation. Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons and entities, other than Defendants, who purchased the securities of IBM during the period of January 18, 2018, and October 16, 2018, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its present and former officers and/or directors and who knowingly or recklessly engaged in a device, scheme, or artifice to defraud, engaged in acts, practices, and courses of business conduct designed to deceive investors, and who knowingly or recklessly made false statements of material fact during the Class Period.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District. Defendant IBM maintains its headquarters and conducts business in this District.

5.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff, June E. Adams Irrevocable Trust Dated 7/21/14 FBO Edward Robert Adams as set forth in the certification attached hereto and incorporated herein by reference, purchased IBM securities during the Class Period and has been damaged thereby.

7.     Defendant IBM is organized under the laws of the State of New York and headquartered in Armonk, New York. IBM ranks among the world's largest information technology companies, providing a wide spectrum of hardware, software, and service offerings. The Company's common stock is listed on the NYSE, an efficient market, under the ticker symbol "IBM."

8.     Defendant Virginia M. Rometty ("Rometty") served as an Officer of the Company from 2005 through December 2020. She served as CEO, President and Chairman of IBM from early 2012 through April 1, 2020, and then became Executive Chairman until her retirement on December 31, 2020.  In 2017, Rometty's total compensation was $18.6 million, with $6.7 million in cash and the remainder in equity awards. In 2018, her total compensation was $17.6 million, with $5.7 million in cash and the remainder in equity awards.

9.     Defendant Martin J. Schroeter ("Schroeter") served as an Officer of the Company from 2014 through his departure to become CEO of Kyndryl. He served as CFO from January 2014 through December 2017. From January 2018 through April 2020 Schroeter served as IBM's Senior Vice President, Global Markets. In January 2021, Schroeter was named the CEO of Kyndryl, the new independent company that was created following the spin-off of IBM's Managed Infrastructure Services Business. Schroeter originally joined IBM in 1992 and served in various

roles worldwide. In 2017, Schroeter's total compensation was $6.5 million, with $2.028 million in cash and the remainder in equity awards. Schroeder led the Company's investor earnings conference on January 18, 2018, as out-going CFO.

10.     Defendant James J. Kavanaugh ("Kavanaugh") has served as an Officer of the Company since 2008. He has served as Chief Financial Officer of the Company from January 2018 through the present. He also served as Senior V.P, Finance and Operations in 2017 as a Named Executive Officer. Kavanaugh compensation: (i) 2017: $4.9 million in total compensation with cash of $1.568 million and the remainder in equity awards; (ii) 2018: $5.9 million in total compensation with $1.568 million in cash and remainder in equity awards.

11.     Defendant Arvind Krishna ("Krishna") has served the Company as CEO and a director since April 2020. He was elected chairman of the Board of Directors in December 2020. Krishna joined IBM in 1990. He led the IBM Cloud and Cognitive Software business unit from 2017 to April 2020, and also served as the director of IBM's Research division from 2015 to 2020. Previously, he was general manager of IBM's Systems and Technology Group, IBM's development and manufacturing organization. Prior to that, he built and led many of IBM's data-related businesses. Krishna's compensation in 2020 was $17 million in total compensation with cash of $3.56 million and the remainder in equity compensation. During the Class Period, Krishna reported to Rometty.

12.     Defendant Bridgette Van Kralingen ("Van Kralingen") was Sr. V.P., Global Sales and Markets from April 2020 through December 2021. Prior, she served as : (i) Sr. V.P. Blockchain,  Industry Platforms, Global Industries, IAs and Partnerships from September 2018 through March 2020; (ii) Senior V.P., Industry Platforms from September 2016 through August 2018; and (iii) Sr. V.P. , IBM Global Services during the Class Period and directly reported to

Rometty. She was considered Rometty's second in command and confidant. Van Kralingen herself had 22 direct reports many of which are named defendants herein.

13.     Defendant Shanker Ramamurthy ("Ramamurthy") has served and is currently serving as Global Managing Partner since June 2020 and prior served as General Manager Strategy Market and Development from June 2017 through June 2020. Prior, he was CTO & General Manager Strategy and Solutions, GBS from January 2016 through December 2016. He also served as Global Managing Partner – Strategy and Analytics.

14.     Defendant Pablo Suarez ("Suarez") is serving and has served as V.P. & Global Leader, Financial Services Sector Center of Competence and Digital Banking from March 2017 through the Present. Previously he served as V.P., Global Strategic Initiatives, Banking and Financial Markets from March 2015 through February 2017. Suarez has been employed at IBM over 26 years.

15.     Defendant Sarah Diamond ("Diamond") was Global Managing Director Financial Services sector from April 2017 through December 2021. Previously, she served as General Manager, Global Industries from 2015 to 2017. Diamond was employed at IBM for 17 years.

16.     Defendant Alistair Rennie ("Rennie") was General Manager, Solutions, IBM Analytics from January 2014 through January 2020. Rennie was employed at IBM for over 14 years.

17.     Defendant Mark Andrews ('Andrews") was an IBM V.P., Financial Services Solutions from October 2004 through October 2019. Andrews was employed by IBM for over 15 years.

18.     Defendant Don India ("India") was V.P. Watson Financial Services Solutions, NA Financial Services Market from January 2017 through September 2018, as Global Director

Customer Analytics from April 2015 through January 2017, and Chief of Staff to General Manager of Business Analytics from April 2014 through March 2015. India was employed by IBM for over 20 years.

19.     Defendant Chris Johnston ("Johnston")  served as North American Business Unit Executive, Watson Financial Services from January 2017 through October 2018. Prior he served as Global Business Unit Executive, Analytics Solutions from 2015 through 2017, and as North American Sales Leader, Cloud and Smarter Infrastructure from March 2012 through February 2015. Johnston was employed by IBM for over 14 years.

20.     Defendant Mark Foster ("Foster") is and has been serving as Chairman of IBM Consulting from January 2022 through the Present. Previously, Foster was Sr. V.P. IBM Consulting from October 2021 through January 2022 and Sr. V.P. GBS from January 2016 through January 2022.

21.     Defendants Rometty, Schroeter and Kavanaugh are collectively referred to as the "Maker Defendants". Defendants Krishna, Van Kralingen,  Ramamurphy,  Suarez, Diamond, Rennie, Andrews, India, Johnston, and Foster are collectively referred to as the "Scheme Defendants", and with the Maker Defendants, are referred to as the "Individual Defendants". IBM and the Individual Defendants are referred to herein, collectively, as "Defendants."

22.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was aware that the false and misleading statements were being issued concerning the Company; and

(f)     approved or ratified these statements in violation of the federal securities laws.

23.     As officers, directors, and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue so as to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information. In addition, the Individual Defendants were duty bound not to employ any device, scheme, or artifice to defraud, or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

24.     IBM is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment for the benefit of IBM.

25.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to IBM under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

26.     IBM is an information technology company. Over the last two decades, IBM has focused primarily on mainframe computing, developing and advancing powerful central computers (CPU), linked to thousands of users through less powerful devices such as PC workstations or terminals (just monitor and keyboard). Large organizations use mainframes for mission-critical applications, requiring high volumes of data processing. These systems are known for their large amount of storage and processing power. IBM's mainframe hardware and software products are considered ideal for a growing number of transactions and data sets as they possess capabilities to allow huge numbers of users and applications to access the same data among each other simultaneously without any interference.

27.     Prior to and during the Class Period, IBM's z Systems continued to dominate the mainframe market, owing to significant adoption of IBM mainframe solutions among IBM's large institutional customer base.  Among its tens of thousands of customers world-wide, 44 of the top 50 banks, healthcare organizations and government agencies in the U.S., as well as all the top 10 insurers, have been using IBM z mainframes for their business-critical applications. The mainframe computer, along with its embedded proprietary software, became IBM's staple product over which it has near monopolistic market share of over 90%.

28.     Although IBM's mainframe business continues to generate billions in revenues each year -- primarily from monthly licensing charges, usage-based data processing fees, and service and support offerings -- the market for mainframes has been waning ever since the advent of powerful PCs, mainframe offerings from IBMs competitors, and now cloud computing. Accordingly, by 2011 IBM's total revenue and income peaked and began to decline.

29.     In response, IBM began reinventing itself from a mainframe supplier to a "cognitive solutions" and cloud computing platform company, highlighting its "networked, modularized and embedded technologies, as well as business intelligence and analytics" software offerings. As a follow up, in 2011 IBM began marketing its Watson computing system as a brand for its artificial intelligence applications. Investors rewarded IBM for this more focused direction, driving IBM's stock price from $123.48 per share on April 1, 2010, to $208.65 per share on January 1, 2012.

30.     After becoming IBM's CEO in 2012, and through early 2016, Defendant Rometty attempted to focus IBM's new direction further as Defendants struggled to overcome IBM's declining revenues and downward trending stock price. This effort included Defendants' identification of IBM's "Strategic Imperatives" to drive the Company's focus, and future, toward its reinvention around its cognitive solutions and cloud computing business lines, as well as Defendants' allocation of revenues from these business lines into distinct components of "Cloud," "Analytics," "Mobile," "Security," and "Social," collectively referred to as "CAMSS."

31.     To demonstrate publicly its transition away from mainframe sales and services and its successful and profitable reinvention of IBM into an IT services company, Defendants publicly identified and disclosed financial results for "Strategic Imperatives" and CAMSS breaking out those segments from revenue as a whole. Accordingly, Defendants needed to report that as a percentage of total revenue, Strategic Imperatives and CAMSS revenue continued to increase. As information services businesses shifted away from mainframes, showing increasing Strategic Imperatives and CAMSS revenue was essential to IBM's continuing to grow its business.

32.     To do so, Defendants misled the market, engaging in a fraudulent scheme to report billions of dollars in mainframe segment and other non-strategic revenues as Strategic Imperatives and CAMSS revenues, enabling Defendants to report publicly materially distorted segment

information. Defendants portrayed Strategic Imperatives and CAMSS as growing materially beyond actual growth, materially misrepresenting IBM's shift away from its stagnant legacy mainframe segment. Having chosen to report these revenue segments, Defendants were duty bound not to lie about the revenues properly attributable to IBM's legacy mainframe segment and the business segments IBM conveyed would propel it into the future.

33.     After the close of trading on October 16, 2018, Defendants disclosed a shortfall in revenue and disappointing 3Q2018 growth associated with the Company's Strategic Imperatives and CAMSS lines of business, particularly its Cloud business line. This caused IBM's stock price to decline approximately $11.00 per share from the close of trading on October 16, 2018, to the close on trading on October 17, 2018. After reporting its fourth quarter and year end 2018 results, IBM stopped reporting revenue for Strategic Imperatives and CAMSS, thereafter reporting Total Annual Revenue without any breakdown among segments.

34.     Defendants misclassified/reclassified legacy mainframe revenue as Strategic Imperatives Revenue to deceive investors into believing that its transition from legacy mainframe revenues was successful. Defendants misclassified revenue from the mainframe side of the business as Strategic Imperative Revenue through its 3-5 year Enterprise License Agreements ("ELA") with its significant banking, healthcare and insurance company customers. Defendants used steep discounting on the mainframe part of the ELA in return for the customer purchasing catalog software (i.e., Strategic Imperative Revenue), unneeded and unused by the customer. In this way Defendants were able to book what was mainframe revenue as Strategic Imperative Revenue.  Defendants also shifted business from its non-strategic GBS segment to Watson, to claim the revenue as Strategic Imperative Revenue and prop up the failing Watson brand that the Company touted. The two-part scheme involving the ELAs and shifting of business from GBS to

Watson is referred to as the "Scheme". At the behest of senior executives, sales personnel manipulated ELAs and shifted GBS business to Watson in order to report increasing Strategic Imperative Revenue, satisfying market expectations.

35.     While Defendants touted Strategic Imperatives as the key to IBM's evolving from a mainframe company to meet the needs of its customers in a changing digital world, they publicly reported materially increasing Strategic Imperatives Revenues:

| Fiscal Year | Strategic Imperatives revenue as % of total revenue |
|---|---|
| 2014 | 27% |
| 2015 | 35% |
| 2016 | 41% |
| 2017 | 46% |
| 2018 | 50% |

36.     In violation of Generally Accepted Accounting Principles ("GAAP"), the Company failed to account for the economic substance of these transactions (violating the basic principle of accounting). The financial statements and the notes thereto did not disclose this fact. Accordingly, the overall impression created by the financial statements did not present the business realities of the Company

**Defendants' False and Misleading Statements**

37.     The Class Period begins on January 18, 2018. On January 18, 2018, the Company issued a press release for its preliminary financial results for the 4Q2017 and FY2017. The Company reported that FY2017 Strategic Imperatives Revenues of $36.5 billion were up 11 percent, representing 46 percent of IBM revenue. 4Q2017 Strategic Imperatives revenue was up 17 percent (up 14 percent adjusting for currency). "IBM's strategic imperatives revenue again grew at a double-digit rate and now represents 46 percent of our total revenue, and we are pleased with our overall revenue growth in the quarter," said Ginni Rometty, IBM chairman, president and

chief executive officer.  "During 2017, we strengthened our position as the leading enterprise cloud provider and established IBM as the blockchain leader for business.  Looking ahead, we are uniquely positioned to help clients use data and AI to build smarter businesses."

38.     As to CAMSS, the press release reported on its 4Q2017 that fourth-quarter cloud revenues increased 30 percent to $5.5 billion (up 27 percent adjusting for currency).  Cloud revenue over the last 12 months was $17.0 billion, including $9.3 billion delivered as-a-service and $7.8 billion for hardware, software and services to enable IBM clients to implement comprehensive cloud solutions.  The annual exit run rate for as-a-service revenue increased to $10.3 billion from $8.6 billion in the fourth quarter of 2016.  In the quarter, revenues from analytics increased 9 percent (up 6 percent adjusting for currency).  Revenues from mobile increased 23 percent (up 21 percent adjusting for currency) and revenues from security increased 132 percent (up 127 percent adjusting for currency).

39.     That same day the Company also filed IBM's 4Q2017 Earnings Presentation with the SEC (attached to the Form 8-K), that contained financial information concerning Strategic Imperative Revenue contribution to the Company's Segments: (i) CS $3.5 billion; (ii) GBS $2.6 billion, (iii) TS&CP $2.9 billion, and (iv) Systems $2.1 billion. Total overall Strategic Imperatives Revenue for 1Q2017 was $11.1 billion. Scchroeter led the call as outgoing CFO.

40.     The foregoing statements were  materially false and misleading and/or omitted to disclose that: (i) Strategic Imperatives Revenue growth, CAMSS and CAMSS Components' revenue growth, and the Company's Segments' revenue growth were artificially inflated as a result of the wrongful reclassification/misclassification of revenues from non-strategic to strategic to make those revenues eligible for treatment as Strategic Imperatives Revenue; and (ii) IBM was materially less successful in growing its Strategic Imperative business, reporting materially higher

growth than it actually achieved only by wrongfully reclassifying and misclassifying revenue from non-strategic to strategic thereby reporting publicly materially false Strategic Imperative Revenue.

41.     On February 27, 2018, the Company filed its 4Q2017 and FY2017 Form 10-K (ex.13) with the SEC. As to CAMSS for FY2017:

> In 2017, the company continued to deliver solid revenue growth in its strategic imperatives which generated $36.5 billion of revenue and grew 11 percent as reported and adjusted for currency, with double-digit growth in cloud, security and mobile, as the company continues to build new products and offerings and continuously reinvent its platforms. These are not separate businesses, they are offerings across the segments that address opportunities in analytics, cloud, security and mobile. The company is embedding cloud and cognitive capabilities across the business and the strategic imperatives reflect the progress being made in helping enterprise clients extract value from data and become digital businesses. Strategic imperatives growth in 2017 largely represented organic growth as the acquisitive content leveled on a year-to-year basis. Total Cloud revenue of $17.0 billion increased 24 percent as reported and adjusted for currency, with as-a-Service revenue up 31 percent as reported and adjusted for currency. The annual exit run rate for as-a-Service revenue increased to $10.3 billion in 2017 compared to $8.6 billion in 2016. Analytics revenue of $20.6 billion increased 6 percent as reported and adjusted for currency. Mobile revenue increased 19 percent as reported and adjusted for currency and Security revenue increased 55 percent (54 percent adjusted for currency), driven by security software solutions and strong demand for the pervasive encryption capabilities in the new z14 mainframe.

42.     The 2017 Form 10-K (ex. 13) also reported CAMSS fourth quarter results. As to CAMSS 2017 fourth quarter results:

> In the fourth quarter, the company continued to deliver solid growth in its strategic imperatives which generated $11.1 billion of revenue and grew 17 percent as reported and 14 percent adjusted for currency, led by cloud and security, as the company continues to embed AI and cloud into its offerings. The strategic imperatives are not separate businesses, they are offerings across the segments that address opportunities in analytics, cloud, security and mobile. Strategic imperatives growth in the fourth quarter continued to largely represent organic growth as the acquisitive content has leveled on a year-to-year basis. Total Cloud revenue of $5.5 billion increased 30 percent as reported and 27 percent adjusted for currency as the company enables clients to implement comprehensive cloud solutions. Cloud-asa-Service revenue was up 20 percent (18 percent adjusted for currency) and the annual exit run rate for as-a-Service revenue increased to $10.3 billion in the fourth quarter of 2017 compared to $9.4 billion in the third quarter of 2017. Analytics revenue of $6.1 billion increased 9 percent as reported (6

percent adjusted for currency). Mobile revenue increased 23 percent (21 percent adjusted for currency) and Security revenue more than doubled year to year, reflecting the strong demand for the pervasive encryption capabilities in IBM Z and good performance in both managed security services within Technology & Cloud Platforms and in security software.

43.     As to IBM's Segments, the Company reported 4Q2017 and FY2017 financial results for IBM Segments' Strategic Imperatives revenue: (i) Cognitive Solutions total fourth-quarter Strategic Imperatives revenue of $3.5 billion was flat year to year as reported and decreased 3 percent adjusted for currency. Cloud revenue of $0.7 billion grew 8 percent as reported and 6 percent adjusted for currency, with an as-a-Service exit run rate of $2.1 billion. Cognitive Solutions total Strategic Imperatives revenue for FY2017 of $12.0 billion grew 2 percent year to year as reported and adjusted for currency; Cloud revenue of $2.5 billion grew 19 percent as reported and adjusted for currency, with an as-a-Service exit run rate of $2.1 billion; (ii) GBS total fourth-quarter Strategic Imperatives revenue of $2.6 billion grew 9 percent as reported (7 percent adjusted for currency) year to year. Cloud revenue of $1.1 billion grew 19 percent as reported (17 percent adjusted for currency), with an as-a-Service exit run rate of $1.3 billion. Within GBS, FY2017 total Strategic Imperatives Revenue of $9.8 billion grew 10 percent as reported and adjusted for currency year to year. Cloud revenue of $4.0 billion grew 34 percent as reported (35 percent adjusted for currency), with an as-a-Service exit run rate of $1.3 billion; (iii) Technology Services & Cloud Platforms fourth quarter Strategic Imperatives Revenue of $2.9 billion grew 15 percent year to year as reported (12 percent adjusted for currency). Cloud revenue of $2.0 billion grew 13 percent as reported (10 percent adjusted for currency), with an as-a-Service exit run rate of $6.9 billion; and (iv) Systems strategic fourth quarter imperatives revenue of $2.1 billion grew 91 percent year to year as reported (86 percent adjusted for currency). Cloud revenue of $1.7 billion grew 90 percent as reported (86 percent adjusted for currency).

44.     The foregoing statements were  materially false and misleading and/or omitted to disclose that: (i) Strategic Imperatives Revenue growth, CAMSS and CAMSS Components' revenue growth, and the Company's Segments' revenue growth were artificially inflated as a result of the wrongful reclassification/misclassification of revenues from non-strategic to strategic to make those revenues eligible for treatment as Strategic Imperatives Revenue; and (ii) IBM was materially less successful in growing its Strategic Imperative business, reporting materially higher growth than it actually achieved only by wrongfully reclassifying and misclassifying revenue from non-strategic to strategic thereby reporting publicly materially false Strategic Imperative Revenue.

45.     On  March 12, 2018, the Company filed its 2018 Proxy Statement. The Company kept, with Board approval, Strategic Imperatives as 1 of 3 key financial metrics. The reason given was that it supports portfolio shift into a cognitive solutions and cloud platform company that will deliver the highest value opportunities for our clients and stockholders. Other highlights included: (i) Since 2015, IBM invested $37 billion, reshaping their business profile with nearly 60% directed toward high growth Strategic Imperatives; (ii) Revenue from the Company's Strategic Imperatives of cloud, analytics, mobile, social and security has reached a critical mass in 2017, growing to $36.5B, led by growth in cloud and security, representing 46% of IBM's total revenue; and (iii) Security revenue grew 23% compounded, nearly doubling in size. The fraudulent scheme would continue.

46.     On April 7, 2018, IBM filed a Form 8-K with its preliminary results for 1Q2018. Attached to the Form 8-K was the Company's Earnings presentation. With regard to Strategic Imperatives contribution to IBM Segments revenue it reported the following: (i) CS $2.8 billion; (ii) GBS $2.5 billion; (iii) TS&CP $3.0 billion; and (iv) Systems $0.7. Total Strategic Imperative Revenue for 1Q2018 was $9.0 billion.

47.    On April 24, 2018, IBM filed its 1Q2018 Form 10-Q with the SEC. The MD&A was replete with praise for Strategic Imperatives and its growing revenue model and ever-increasing larger slice of the overall business. The MD&A stated in pertinent part:

> In the first quarter of 2018, the company reported $19.1 billion in revenue, $1.7 billion in income from continuing operations and operating (non-GAAP) earnings of $2.3 billion, resulting in diluted earnings per share from continuing operations of $1.81 as reported and $2.45 on an operating (non-GAAP) basis. The company also generated $4.6 billion in cash from operations and $1.3 billion in free cash flow in the first quarter of 2018 and delivered shareholder returns of $2.2 billion through gross common stock repurchases and dividends. The first-quarter results demonstrate the work the company has done to reposition the business to lead in the high-value segments of IT, its differentiated value proposition and that its financial strategy and model are built to deliver to clients and shareholders over the long term.

> Total consolidated revenue increased 5.1 percent as reported and was flat year to year adjusted for currency. The company continued to have solid revenue growth in its strategic imperatives, led by cloud and security. Year-to-year revenue performance in the first quarter of 2018 improved sequentially compared to the fourth quarter of 2017 growth rates in the Cognitive Solutions, Global Business Services (GBS) and Technology Services & Cloud Platforms segments.

> From a segment perspective, Cognitive Solutions revenue increased 5.8 percent as reported and 2 percent adjusted for currency, compared to first-quarter 2017, with continued growth in security software and industry platforms and a return to growth in analytics. GBS revenue increased 4.2 percent as reported, but decreased 1 percent adjusted for currency. Consulting increased 5.5 percent as reported and was flat adjusted for currency and Application Management increased 4.1 percent as reported, but decreased 2 percent adjusted for currency. Within GBS, strategic imperatives revenue increased 12 percent as reported and 6 percent adjusted for currency year to year reflecting the ongoing shift to areas of higher client value. Technology Services & Cloud Platforms increased 5.0 percent as reported, but decreased 1 percent adjusted for currency, representing a sequential improvement of 6.2 points as reported and 3 points adjusted for currency, from fourth-quarter 2017 growth rates. Within Technology Services & Cloud Platforms, strategic imperatives revenue was up 24 percent as reported and 19 percent adjusted for currency year to year. Systems increased 7.5 percent as reported and 4 percent adjusted for currency driven by strong growth in IBM Z and a second consecutive quarter of growth in Power Systems.

> Strategic imperatives revenue of $9.0 billion increased 15 percent as reported and 10 percent adjusted for currency in the first quarter, with double-digit growth in cloud, security and mobile, as the company continues to build new platforms and

solutions and embeds cloud and AI capabilities across the business. Strategic imperatives revenue over the last 12 months was $37.7 billion, an increase of 12 percent as reported and 10 percent adjusted for currency, representing 47 percent of the company's total revenue. Total Cloud revenue in the first quarter of 2018 of $4.2 billion increased 20 percent as reported and 14 percent adjusted for currency, with as-a-Service revenue up 25 percent as reported and 20 percent adjusted for currency. The annual exit run rate for as-a-Service revenue increased to $10.7 billion in the first quarter of 2018 compared to $8.6 billion in the first quarter of 2017. Analytics revenue of $4.8 billion increased 9 percent as reported and 4 percent adjusted for currency. Mobile revenue increased 19 percent as reported and 14 percent adjusted for currency and Security revenue increased 65 percent (60 percent adjusted for currency), reflecting strong demand for the company's highly-integrated security software, security managed services and the pervasive encryption capabilities in the z14 mainframe, and growth in security software solutions.

48.     As to the Company's individual segments, the 1Q2018 stated, in pertinent part:

Cognitive Solutions revenue of $4,299 million grew 5.8 percent as reported and 2 percent adjusted for currency in the first quarter of 2018 compared to the prior year as the company continued to scale new platforms and solutions and increase its SaaS offerings. There was year-to-year growth in both Solutions Software and Transaction Processing Software on an as-reported and constant currency basis. …

Cognitive Solutions total strategic imperatives revenue of $2.8 billion grew 6 percent year to year as reported (2 percent adjusted for currency). Cloud revenue of $0.6 billion grew 6 percent as reported (4 percent adjusted for currency), with an as-a-Service exit run rate of $2.0 billion. …

Global Business Services revenue of $4,174 million grew 4.2 percent as reported (decreased 1 percent adjusted for currency) in the first quarter of 2018 compared to the prior year. These results reflect modest improvement in the year-to-year performance compared to the fourth quarter of 2017. As the company continues to transform this business, GBS signings grew again in the quarter, both as reported and adjusted for currency. There was growth year to year in strategic imperatives revenue reflecting the ongoing shift to areas of higher client value, such as cloud and analytic. …

Within GBS, total strategic imperatives revenue of $2.5 billion grew 12 percent as reported (6 percent adjusted for currency) year to year. Cloud revenue of $1.0 billion grew 19 percent as reported (12 percent adjusted for currency), with an as-a-Service exit run rate of $1.2 billion. …

Technology Services & Cloud Platforms revenue of $8,625 million grew 5.0 percent as reported (decreased 1 percent adjusted for currency) in the first quarter

of 2018 compared to the prior year. These results reflected improvement in year-to-year performance, as reported and adjusted for currency compared to the fourth quarter of 2017. In the first quarter, signings grew double digits as clients continue to recognize the long-term value of the company's offerings and capabilities. …

Within Technology Services & Cloud Platforms, strategic imperatives revenue of $3.0 billion grew 24 percent year to year as reported (19 percent adjusted for currency) in the first quarter of 2018. Cloud revenue of $2.1 billion grew 26 percent as reported (20 percent adjusted for currency), with an as-a-Service exit run rate of $7.4 billion. …

Systems revenue of $1,500 million grew 7.5 percent year to year as reported (4 percent adjusted for currency) in the first quarter of 2018 compared to the prior year. The company has modernized its systems for the most contemporary workloads and, within Systems Hardware, revenue of $1,093 million grew 9.2 percent year to year as reported (6 percent adjusted for currency). This performance was driven by strong z14 momentum and growth in Power Systems, partially offset by a decline in Storage Systems, as reported and adjusted for currency. Operating Systems Software revenue of $407 million grew 3.2 percent as reported (decreased 1 percent adjusted for currency) compared to the prior year. …

Within Systems, total strategic imperatives revenue of $0.7 billion grew 28 percent as reported (24 percent adjusted for currency) year to year in the first quarter of 2018. Cloud revenue of $0.5 billion grew 16 percent as reported (12 percent adjusted for currency).

49.    The foregoing statements were  materially false and misleading and/or omitted to disclose that: (i) Strategic Imperatives Revenue growth, CAMSS and CAMSS Components' revenue growth, and the Company's Segments' revenue growth were artificially inflated as a result of the wrongful reclassification/misclassification of revenues from non-strategic to strategic to make those revenues eligible for treatment as Strategic Imperatives Revenue; and (ii) IBM was materially less successful in growing its Strategic Imperative business, reporting materially higher growth than it actually achieved only by wrongfully reclassifying and misclassifying revenue from non-strategic to strategic thereby reporting publicly materially false Strategic Imperative Revenue.

50.    On July 18, 2018, IBM issued a press release reporting preliminary financial results for 2Q2018. The Company reported $10.1 billion in Strategic Imperative Revenue and

again purportedly played a prominent role in IBM's 2Q2018 financial performance. The press release stated, in pertinent part:

> Strategic Imperatives Revenue
>
> Strategic imperatives revenue over the last 12 months was $39.0 billion, up 15 percent (up 12 percent adjusting for currency).  Total cloud revenue over the last 12 months was $18.5 billion, up 23 percent (up 20 percent adjusting for currency), with $8.2 billion from hardware, software and services to enable IBM clients to implement hybrid cloud solutions across public, private and multi-cloud environments, and $10.4 billion delivered as a service.  The annual exit run rate for as-a-service revenue increased in the quarter to $11.1 billion, up 26 percent (up 24 percent adjusting for currency).
>
> In the second quarter, revenues from analytics increased 7 percent to $5.4 billion (up 5 percent adjusting for currency); revenues from mobile increased 5 percent to $1.3 billion (up 3 percent adjusting for currency); and revenues from security increased 81 percent to $1.0 billion (up 79 percent adjusting for currency).

51.    At the close of market on July 18, 2018, IBM held an earnings conference call with Defendant Kavanaugh the presenter for the Company.  The importance of Strategic Imperatives to the Company's future was made clear by Kavanaugh. He stated, in pertinent part:

> In the second quarter, we delivered $20 billion of revenue, …
>
> Across our segments, we had continued momentum in our strategic imperatives revenue. Over the last twelve months, our strategic imperatives revenue has grown to $39 billion, which represents 48% of IBM's revenue. And within that, cloud is now $18.5 billion.
>
> Our strategic imperatives revenue in the quarter was up 15%, and accelerated to 13% at constant currency. Revenue performance this quarter was led by Security and Cloud. Security was up about 80% this quarter, driven by strong demand for the pervasive encryption of IBM Z and growth in our integrated software and services business. …
>
> So now let's get into the two segments. Global Business Services returned to modest revenue growth, increased gross profit dollars, and expanded gross margin. We're realizing the improved revenue trajectory from the run-out of our opening backlog for the year. Our Strategic Imperatives revenue grew 6% with strong performance in the as-a-service offerings, which were up 25%.
>
> Technology Services and Cloud Platforms, revenue returned to growth. Similar to GBS, this performance was driven primarily by our improved opening backlog

run-out dynamics. The strategic imperatives revenue in the segment grew 24%. This was led by Cloud, which grew 27% and our as-a-service revenue grew 30%, which is up about 6 points sequentially and is now at an at an annualized run rate of $7.6 billion

In summary, our performance this quarter underscores the extent to which we have repositioned our business over the last several years. As I said, nearly half of our revenue is aligned to the strategic imperatives, which represent the emerging, high-value, high-growth segments in our industry. This also reflects a major portfolio shift for IBM, driven, as we discussed at our investor webcast in March, by major shifts in our capital allocation and investment strategy.

52.     On that same day, IBM filed a Form 8-K with its preliminary results for 2Q2018. Attached to the Form 8-K was the Company's Earnings presentation. With regard to Strategic Imperatives contribution to IBM Segments revenue it reported the following: (i) CS $3.0 billion; (ii) GBS $2.7 billion; (iii) TS&CP $3.1 billion; and (iv) Systems $1.2. Total Strategic Imperative Revenue for 2Q2018 was $10.0 billion.

53.     IBM filed its 2Q2018 Form 10-Q with the SEC on July 31, 2018. Concerning Strategic Imperatives Revenue and growth, CAMSS revenue and growth, and the amount that Strategic Imperatives contributed to the Company's Segments and the Company overall, the 2Q2018 Form 10-Q stated, in pertinent part:

Total consolidated revenue increased 3.7 percent as reported and 1.6 percent adjusted for currency ... There was continued momentum in revenue across the strategic imperatives in the second quarter, led by cloud and security.

From a segment perspective, Cognitive Solutions revenue increased 0.5 percent as reported but decreased 1 percent adjusted for currency, compared to second-quarter 2017. There was continued growth in analytics and good performance in industry verticals driven by financial services and IoT, offset by areas where the company is repositioning its portfolio. In the second quarter, the revenue trajectory improved at constant currency in both services segments compared to the first quarter of the year. Global Business Services (GBS) revenue increased 2.3 percent as reported and was flat year to year adjusted for currency. Consulting increased 6.0 percent as reported and 4 percent adjusted for currency, while Application Management revenue decreased 0.5 percent as reported and 3 percent adjusted for currency. GBS strategic imperatives revenue increased 8 percent as reported and 6 percent adjusted for currency reflecting the ongoing shift to areas of higher client value. Technology

Services & Cloud Platforms (TS&CP) increased 2.5 percent as reported and was flat adjusted for currency with growth in Infrastructure Services and Integration Software offset by a decline in Technical Support Services, as reported and adjusted for currency. TS&CP strategic imperatives revenue was up 26 percent as reported and 24 percent adjusted for currency year to year. Systems delivered strong revenue performance in the quarter of 24.6 percent as reported and 23 percent adjusted for currency, with growth across all three hardware brands.

Strategic imperatives revenue of $10.1 billion increased 15 percent as reported and 13 percent adjusted for currency in the second quarter, led by cloud and security. Cloud revenue of $4.7 billion increased 20 percent (18 percent adjusted for currency) driven by as-a-Service revenue which grew 26 percent as reported and 24 percent adjusted for currency. The annual exit run rate for as-a-Service revenue increased to $11.1 billion in the second quarter of 2018 compared to $8.8 billion in the second quarter of 2017. Security grew 81 percent as reported (79 percent adjusted for currency) driven by strong demand for the pervasive encryption of IBM Z and growth in integrated software and services. Analytics revenue of $5.4 billion increased 7 percent as reported and 5 percent adjusted for currency. Mobile revenue increased 5 percent as reported and 3 percent adjusted for currency.

54.     The foregoing statements were materially false and misleading and/or omitted to disclose that: (i) Strategic Imperatives Revenue growth, CAMSS and CAMSS Components' revenue growth, and the Company's Segments' revenue growth were artificially inflated as a result of the wrongful reclassification/misclassification of revenues from non-strategic to strategic to make those revenues eligible for treatment as Strategic Imperatives Revenue; and (ii) IBM was materially less successful in growing its Strategic Imperative business, reporting materially higher growth than it actually achieved only by wrongfully reclassifying and misclassifying revenue from non-strategic to strategic thereby reporting publicly materially false Strategic Imperative Revenue.

**The Truth Is Revealed**

55.     On October 16, 2018, IBM stock closed at $145.12 per share. After the close of the market that day, IBM issued a press release announcing its preliminary results for 3Q2018. The Company reported revenue of $18.8 billion, down 2 percent and slowing growth in Strategic Imperatives. As to Strategic Imperatives the press release had a separate section stating:

Strategic imperatives revenue over the last 12 months was $39.5 billion, up 13 percent (up 11 percent adjusting for currency). Total cloud revenue over the last 12 months was $19.0 billion, up 20 percent (up 18 percent adjusting for currency), with $8.1 billion from hardware, software and services to enable IBM clients to implement hybrid cloud solutions across public, private and multi-cloud environments, and $10.9 billion delivered as a service. The annual exit run rate for as-a-service revenue increased in the quarter to $11.4 billion, up 21 percent (up 24 percent adjusting for currency).

56.     In connection with the 3Q2018 financial performance, Defendant Rometty commented in the press release that, "IBM's progress and momentum this year in the emerging, high-value Segments of the IT industry are driven by our innovative technology, deep industry expertise and commitment to trust and security."

57.     The Company held an earnings conference call that same evening. Defendant Kavanaugh led the call for IBM. As to Strategic Imperatives he stated:

We continue to see strong client demand in the emerging high-value segments of the IT industry. And our performance this quarter was driven by the offerings in hybrid cloud, in security, in digital, and in analytics and AI, a testament to our ability to deliver differentiated value to our clients through innovative technologies with the skills and expertise to implement these technologies. We see the results in our strategic imperatives revenue growth of 13% over the last 12 months. We also see this playing out in higher operating margin over the last few quarters, which supports both our long-term investment and return to shareholders. With our success in these higher value areas and our focus on delivering consistent operational performance, we remain on track to our full-year expectations of earnings per share and free cash flow. …

Across our segments, our Strategic imperatives revenue has grown to $39.5 billion over the last 12 months. Within that, our cloud revenue is $19 billion and we exited the third quarter with an as-a-service annual run rate of $11.4 billion, which again was up 24%. While that's already a significant revenue base in the emerging high value segments of the IT industry such as cloud and AI, it's still early in the adoption of these technologies. …

Now some of the underpinnings behind that. One, we still see strong demand in key high value segments and you see that play out in our third quarter performance and we think that will continue moving forward, areas like hybrid cloud where we're winning with our hybrid cloud value proposition in the marketplace, data and AI, security, digital, all of these are instantiated in our strategic imperatives which now from a trailing 12-month perspective were at $39.5 billion, pretty close

to that $40 billion target that we put in place well over three years ago when the IBM company had less than 25% of its portfolio in strategic imperatives. Today we are roughly at 50%. That's a massive transformation over a period of time and that's led to significant improvement in trajectory of our revenue growth overall whereas year-to-date we're up 2%. But underneath that, you see some of the areas of growth around cloud, $19 billion growing 20%. And within that, it's being driven by our high value as-a-service content driving our cloud component, that's up now to $11.4 billion on an annualized exit run rate growing consistently at 24%.

58.     In response to a question from an analyst regarding the market's view that cloud revenue within Cognitive Solutions and Strategic Imperatives had lackluster performance: Kavanaugh stated:

Wamsi Mohan -- Merrill Lynch -- Analyst

Thank you. Jim I was wondering if you can talk a little bit about the strategic comparative performance within Cognitive including the cloud revenues and as a service both of which declined versus overall strategic imperative growth. Can you maybe talk about some of the puts and takes there and some color on what you think drove that client buying seasonality that you mentioned to a prior question? And if I could how do you think that some of these new announcements around AI OpenScale and multi-cloud could change the trajectory for cognitive and when? Thank you.

James J. Kavanaugh -- Senior Vice President and Chief Financial Officer

Okay Wamsi. Thank you very much for your questions. There's a lot there to compact into one answer but let me talk about strategic imperatives first and then I'll get into cognitive next. But let's put the strategic imperatives into perspective. So as I stated on the call trailing 12 months, $39.5 billion we talked about three years ago, we put the signposts out there to hit $40 billion. At that point in time the IBM contribution was less than a quarter of IBM's revenue. Now we're approaching 50%. We're growing in the mid-teens, 13% I think if I remember correctly, over the trailing 12 months and that has lifted IBM's overall revenue growth.

As you've seen year-to-date we're growing 2% at the IBM level. But within that strategic imperatives our cloud business, to your point, is at $19 billion right now, up 20%. And the high value as-a-service component underneath that is up 24% consistent with where we've been in the first half of the year. And I think that's an attestation to we are capturing the new and emerging workloads as the secular shift to as-a-service world is happening overall. Now when you take a look at our strategic imperatives, let's put this in perspective where we were 90 days ago. We knew to hit that $40 billion that we needed to be at basically mid to high single digit growth in the second half and we knew similar to how we laid out our expectation for guidance that we were going to wrap around the most successful

mainframe product program that we've had in history. So as we entered the second half we knew we had to focus on driving that underlying high value as a service content and continue to accelerate that to offset the impacts on that mainframe wrap around on product cycle. And you see in the third quarter our strategic imperatives basically accomplished that. We did what we expected.

So as we look going forward then in the fourth quarter we have to repeat what we just did in the third quarter. In the underlying acceleration in our base services businesses I talked about, the expectation as we have a great pipeline lined up for our software entering the fourth quarter based on those buying cycle seasonality that impact us in third quarter we do expect to hit the $40 billion at the end of the year. And I'll remind you when we set that $40 billion target in 2015 we've lost over $2 billion of revenue due to the strengthening of the US dollar. So you've seen what it's done to transform our portfolio. It's changed the mindset of how we run our Company, how we allocate capital and investment and you see how that's playing up with regard to the improved trajectory.

59.     Recognizing both a revenue shortfall and a slowdown in the growth of Strategic Imperatives Revenue, investors punished IBM stock, bidding it down by $11.07 or 7.6% from the close on October 16, 2018.

60.     An article appearing in Motley Fool on October 19 and an accompanying video filmed on October 17, 2018, analyzed IBM's 3Q2018 performance:

The landscape of the tech industry is dotted with the remains of once-powerful players that grew fast, led for a while, and then failed to pivot with the changing times. It's possible to have a strong second or third act, though, and for a time, it appeared IBM (NYSE:IBM) was on course to achieve a good one. Unfortunately for its shareholders, there was a speed bump on the road to rebound last quarter: The company reported this week that revenue shrank, and growth in its vital "strategic imperatives" businesses slowed. Seriously, when IBM's legacy mainframe business is the strongest performer in a given quarter, one has to see that as a problem.

In this segment of the Market Foolery podcast, host Chris Hill and senior analyst Andy Cross talk about the investment thesis around IBM stock, Warren Buffett's view, the untapped power of Watson, and more.

A full transcript follows the video.

Should you invest $1,000 in International Business Machines Corporation right now?

Before you consider International Business Machines Corporation, you'll want to hear this.

Our award-winning analyst team just revealed what they believe are the 10 best stocks for investors to buy right now... and International Business Machines Corporation wasn't one of them.

The online investing service they've run for nearly two decades, Motley Fool Stock Advisor, has beaten the stock market by over 4X.* And right now, they think there are 10 stocks that are better buys.

This video was recorded on Oct. 17, 2018.

Chris Hill: Shares of IBM are hitting a 52-week low after IBM's third-quarter report. Big Blue had grown revenue for three straight quarters. That streak is over now. To the extent that a $120 billion company can be in trouble, I look at IBM and... not that IBM is in danger of going away, but this is a stalled vehicle on the side of the road.

Andy Cross: It sure is stalled. There had been some faint lights at the end of the tunnel here over the past couple of quarters, when they've been able to grow their quarterly revenues. That flipped this quarter. Their strategic imperatives, which is really their cloud business, their data analytics business, saw some stumbling blocks. Their growth slowed there. They saw a drop in new signings in that business. That stung a little bit. It's been a very tough go for IBM. Their best business this quarter, and really a lot this year, is their legacy mainframe business. That will tend to tail off next year.

There's a lot of excitement in their strategic imperatives in the investments they're making, crypto asset investments they're making, when it comes to cloud computing, when it comes to data analytics, the Watson side. But that's just a really long putt. For this, I really want to be a believer, just because the story of IBM. But I don't own shares, and I think following the direction of Warren Buffett, who exited most of the IBM positions in Berkshire Hathaway, is the way to go with this one.

Hill: Yeah. In some ways, that was a pretty damning, when Buffett sold out of that, when you consider some of the other things that he's held on to. You mentioned Watson. That's the thing that's a little surprising to me. Yes, there are lots of large tech companies that have cloud businesses. To my knowledge, IBM is the one that's got the most recognizable brand, the Watson brand, what they've done with that. The fact that they can't figure out a way to leverage that into a significantly growing business, and therefore a significantly growing share price, is troubling.

Cross: Also, there are 360,000 employees at IBM, I think is the number. We've seen this with General Electric, these big legacy enterprises, it's very hard to get these things turned around, especially in a market today that IBM is operating in. It has aggressive competition, very smart competition, upstart competition, that's been around and doing things very aggressively. IBM lacks a little that cachet. I agree. The Watson brand is extremely powerful. It's been a nice integration into IBM's business. But they haven't seen enough of the big wins to be able to grow

the strategic imperatives. And the fact that it slowed a little bit this quarter, when that was really the bright spot that investors were waiting for -- they were expecting it to be north of 50% of revenues. It fell short of that this quarter on a trailing basis. The momentum is not with IBM, and clearly investors are selling off the stock today.

Hill: It's still a big business.

## The Aftermath

61.     On October 29, 2018, the Company announced the acquisition of Red Hat, Inc. purportedly to enhance its hybrid cloud line of business.

62.     Unbeknownst to the investing public, inside IBM the misclassification/reclassification of non-strategic revenue to strategic revenue  scheme was unraveling due to internal turmoil over internal whistleblower claims concerning the Scheme. While praising the Strategic Imperatives business plan as the Company's driving force for the present and future in "emerging, high-value, high-growth segments in [IBM's] industry," internally, Rometty, Kavanaugh and their cohorts had started to dismantle the Scheme. Even some of the Individual Defendants who were high-ranking executives were shoved out the door in the latter part of 2018.

63.     By early 2019, IBM ceased reporting Strategic Imperatives Revenue, replacing it with total revenues as disclosed in the 2019 Proxy Statement and was now "less and less of a relevant metric" as coined by Defendant Kavanaugh at the earnings conference call on April 16, 2019, in connection with IBM's 1Q2019 financial performance. The myth of Strategic Imperatives had served its purpose of appeasing Wall Street's appetite for non-mainframe revenue. After April 16, 2019, IBM's investors would never hear IBM use the term "strategic imperatives" again. Indeed, Strategic Imperatives Revenue was not reported after the 2018 year-end results were publicly disclosed. CAMSS results would also no longer be reported. And disclosures about Strategic Imperative Revenue that contributed to the Company's Segments also

vanished. In short, IBM's Strategic Imperatives metric was over.

64.     On January 30, 2020, the Company issued a press release announcing that, effective April 1, 2020, Defendant Rometty would be replaced by long-time IBM insider Arvind Krishna as CEO and James Whitehurst, former CEO of Red Hat, Inc. as President. Defendant Rometty remained as Chairman until year end 2020.

## ADDITIONAL SCIENTER ALLEGATIONS

65.     In addition to the scienter allegations set forth above, there are also other indicia of scienter.

66.     At the center of the Scheme was the misclassification/reclassification of mainframe revenue and other non-strategic revenue in order  to increase Strategic Imperative Revenue. The Company admits that "the centerpiece of IBM's strategy is our portfolio shift into five strategic imperatives that we believe are important to the future of enterprise information technology."  Defendants utilized the  mainframe product in order to shift revenues from their mainframe business to Strategic Imperatives and non-strategic revenue to strategic revenue in order to artificially inflate Strategic Imperatives Revenue in order to demonstrate to the marketplace IBM's growth of its non-mainframe business.

67.     According to IBM's 2015 Proxy Statement, Strategic Imperatives Revenue was used as a financial metric for the first time.

68.     Besides being the self-proclaimed visionary and architect of IBM's transformation demonstrated by the Strategic Imperative business strategy, in IBM's 2015 Proxy Statement, the Company admitted it was Rometty who was the one who developed the new strategy of Strategic Imperatives.

69.     As to Defendant Schroeter, he "contributed" to Rometty's Strategic Imperative

mandate by "[f]ocus[ing] investments to build out new offerings and solutions for clients in support of the IBM strategy focused on cloud, analytics, mobile, social and security."

70.     IBM's 2016 Proxy Statement was even more complementary to Defendant Rometty, noting some personal leadership achievements …, all of which are clear signposts of progress in the business's transformation." Some of the items noted included: (i) Realigned and organized IBM to support its strategic direction; (ii) Launched IBM as the pre-eminent Cognitive Business (iii) Shifted $5 billion of spend to accelerate strategic imperatives across cost, expense and capital expenditures; and (iv) Inspired a workforce to all-time high levels of employee engagement.

71.     The 2016 Proxy Statement was equally complimentary to Defendant Schroeter concerning his accomplishments regarding Strategic Imperatives. They were: (i) Exceeded growth targets for the strategic imperatives; (ii) Managed the IBM portfolio, including the announcement of 15 key acquisitions to drive the strategic imperatives and the completion of the divestiture of the Microelectronics business; (iii) Strategic imperatives revenue of $29.8 billion over the last 12 months represents 37 percent of IBM revenue; and (iv) Cloud revenue of $10.8 billion over the last 12 months.

72.     IBM's 2017 Proxy Statement continued the complimentary tone concerning Defendants Rometty and Schroeter. Again, the Proxy Statement cited Defendant Rometty's "personal leadership achievements …, all of which are clear sign posts of the successful business portfolio shift." The 2016 Proxy Statement cited the following accomplishments of Defendant Rometty: (i) Directed investments to Strategic Imperatives — cloud, analytics, mobile, social and security — growing revenue to $33 billion. The Strategic Imperatives contributed 41% of IBM's total revenue; (ii) Expanded IBM's cloud capabilities and broadened the ecosystem with over 50

cloud datacenters; (iii) Accelerated the creation of cognitive-driven value based solutions…. (iv) Drove significant productivity savings through work redesign and the deployment of cognitive solutions across IBM's internal operations, and positioned IBM for future growth by realigning workforce skills with the new portfolio and strengthening all levels of management, including senior management; and (iv) Continued to build on employee engagement momentum, with increases across virtually all markets and business units.

73. Defendant Schroeter also received praise as set forth in IBM's 2017 Proxy Statement including: (i) Shifted IBM's spending profile to focus on Strategic Imperatives; (ii) Invested $15 billion across research & development, capital spending and 15 acquisitions, adding to IBM's capabilities in the high-growth areas of cognitive and cloud with industry focus; and (ii) Implemented new segment reporting structure that aligns to IBM's emergence as a cloud platform and cognitive solutions company.

74. IBM's 2018 Proxy Statement complimented Defendant Rometty on her performance and at the top of the list was her achievement of critical mass with IBM's Strategic Imperatives – cloud, analytics, mobile, social and security. Defendant Schroeder was cited for driving the continuing transformation of the Company. This would be the last year that IBM used Strategic Imperative Revenue as a financial metric and in 2019 it would change to total annual revenue.

75. In 2018, Schroeter became IBM's Sr. V.P., Global Markets. Schroeter was then appointed CEO of Kyndral, the top executive for the new independent company created following the spin-off of IBM's Managed Infrastructure Services Business.

76. Defendant Kavanaugh served as Sr. V.P., Finance and Operations in 2017 prior to his appointment as CFO in 2018.

77.     Further, both Defendant Schroeter and Defendant Kavanaugh as IBM's CFO were responsible for reviewing the financial aspects of the Company's material contracts and therefore had knowledge of the misclassification/reclassification of non-strategic revenue to strategic revenue.

78.     The Scheme Defendants Krisna, Van Kralingen, Ramamurthy, Suarez, Diamond, Rennie, Andrews, India, Johnston, and Foster are all IBM managers/executives who were involved in artificially inflating Strategic Imperative Revenue.

79.     The Scheme can be divided into two parts. First, the Catalog Software stuffing in the long-term ELAs with some of the Company's most significant mainframe customers. By granting steep discounts on the mainframe, IBM coerced its customers to purchase the Catalog software in return. Defendants India and Johnston were instrumental in carrying out this aspect of the fraud with Sales Executives under them selling CAMSS components directly to the customer at the direction of Individual Defendants India and Johnston.

80.     Defendants Rennie, Andrews (who reported to Rennie who then reported to Rometty and Van Kralingen), Ramamurthy, and Krishna were all participants in the Scheme in connection with their leadership roles at Watson, the main beneficiary of the fraud and/or Cloud & Cognitive led by Krishna, the other main beneficiary of the CAMSS scam. All of these individuals reported directly to both Rometty and/or Van Kralingen.

81.     Second, the Scheme involved moving non-strategic GBS segment business to Watson, slap some Watson part on it and call it Watson. In this way, Defendants were able to artificially inflate Strategic Imperative Revenue and book revenue for the failing Watson line of business.

82.     The Scheme Defendants most involved in this aspect of the fraud were

Ramamurthy, Suarez, Diamond and Foster. Ramamurthy reported directly to Rometty and was aided by Suarez in moving non-strategic GBS business to Watson. This caused IBM to book revenue as Strategic Imperative Revenue in the Watson line of business. Some examples involved Mizuno Bank and Ocean Bank deals.

83.    Defendant Diamond was involved primarily with the GBS part of the scheme and was involved in the Ocean Bank deal with Ramamurthy. Diamond did not report to Foster, who led GBS, but reported directly to Van Kralingen. Diamond had been moved to GBS from Watson in early 2017 to aid in the theft of GBS business to the benefit of Strategic Imperatives Revenue and Watson, specifically. In fact, Individual Defendants Rometty, Van Kralingen and Diamond were known internally as the "Three Amigas".

84.    Defendants Ramamurphy, Diamond and Van Kralingen were involved in both aspects of the Scheme.

85.    The Strategic Imperatives Revenue grew by leaps and bounds going from 27% of IBM's total revenue in 2014 to 50% by year end 2018. At the same time, Strategic Imperative Revenue was rapidly growing from 2014 through 2018, IBM's total revenues remained flat or declined, which demonstrates that the mainframe and other non-strategic business was falling at a rapid pace going from 73% of total revenues down to 50% of IBM's total revenues, a drop of 23% in 5 years while IBM maintains 90% of the mainframe marketplace. The only way that happened is through the misconduct alleged herein. Wall Street bought in and IBM was able to demonstrate to the marketplace that IBM was much more than just a mainframe company.

## NO SAFE HARBOR

86.    IBM's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements

from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. See 15 U.S.C. §78u-5(b)(2)(A).

87.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of IBM who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

88.     The market for IBM securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, IBM securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired IBM securities relying upon the integrity of the market price of IBM securities and market information relating to IBM and have been damaged thereby.

89.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of IBM securities and operated as a fraud or deceit on Class Period purchasers

of IBM securities by misrepresenting the value of the Company's business and prospects by providing artificially inflated revenue and growth figures for Strategic Imperatives Revenue, a financial metric manufactured by the Individual Defendants and utilized by the investing marketplace to gauge the Company's financial performance. The Strategic Imperatives Revenue financial metric was also used to determine a small portion of the Company's Annual Incentive Plan award for top executives, specifically 20%, with the remaining 80% tied to cash flow. As the Scheme unraveled, the Company's financial performance suffered, and the market reacted to the news and the artificial inflation came out of the stock price and it fell precipitously. As a result of their purchases of IBM securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

90.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, the Defendants made or caused to be made a series of materially false or misleading statements about IBM's business and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of IBM's current performance and future prospects and its business and operations concerning the Company's "Strategic Imperatives", thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing IBM securities at artificially inflated prices, thus causing the damages complained of herein. When the Defendants' publicly disclosed the Company's poor performance as a pretext for the failure of the Strategic Imperative Revenues, the inflation in the price of IBM securities was removed and

the price of the Company's securities declined dramatically, causing losses to Plaintiff and the other members of the Class.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of IBM securities during the Class Period that suffered compensable damages related to the securities violations alleged herein (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

92.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IBM securities and other publicly-traded securities were actively traded on the NYSE. The Company had approximately 900 million shares of common stock with trading volume in the millions each trading day during the Class Period. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by IBM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

93.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

94.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

95.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of IBM;

    (c)    whether the Individual Defendants caused IBM to issue false and misleading financial statements during the Class Period;

    (d)    whether Defendants acted knowingly in issuing false and misleading financial statements;

    (e)    whether the prices of IBM securities were artificially inflated during the Class Period because of the conduct of Defendants complained of herein; and

    (f)    whether the members of the Class have sustained damages and if so, what is the proper measure of damages.

96.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

97.     Plaintiff will rely, in part, upon the presumption of reliance established by the

fraud- on-the-market doctrine in that:

    (a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    (b)    The omissions and misrepresentations were material;

    (c)    IBM securities are traded in an efficient market;

    (d)    The Company traded on NYSE, and was covered by multiple analysts;

    (e)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

    Plaintiff and other members of the Class purchased and/or sold IBM securities between the time Defendants misrepresented or failed to disclose material facts and the time the adverse facts were disclosed, without knowledge of the misrepresented or omitted facts.

98.    As a result of the foregoing, the market for IBM common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in IBM's stock price. Under these circumstances, all purchasers of IBM common stock during the Class Period suffered similar injury through their purchase of IBM common stock at artificially inflated prices, and a presumption of reliance applies.

99.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

100.    Alternatively, Plaintiff and members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972) as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(B)
PROMULGATED THEREUNDER AGAINST IBM AND THE MAKER DEFENDANTS**

101.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

102.    This Count is asserted against Defendants IBM and the Maker Defendants Rometty, Schroeter and Kavanaugh and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

103.    During the Class Period, in connection with the purchase or sale of securities, these Defendants made various untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Throughout the Class Period, these Defendants knew or recklessly disregarded that their materially false and misleading statements and/or omissions of material fact: (i) deceived the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflated and maintained the market price of IBM securities; and (iii) caused Plaintiff and other members of the Class to purchase or otherwise acquire IBM securities at artificially inflated prices. In furtherance of this unlawful course of conduct, Defendants, and each of them, took the actions set forth herein.

104.    Each of these Defendants participated directly or indirectly in the preparation and/or issuance of, or were responsible for, the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that contained materially false and misleading statements and/or omitted material facts that were designed to and did influence the market for IBM securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to

disclose material adverse information and misrepresented the truth about IBM's operations and financial results concerning Strategic Imperatives Revenue and legacy mainframe business.

105.   IBM and senior managers mentioned herein whose scienter can be imputed to IBM and who are responsible for the materially false and misleading statements and/or material omissions had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, those senior executives whose scienter can be imputed to IBM and who are responsible for the materially false and misleading statements and/or material omissions acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to these Defendants. Those responsible for IBM's materially false and misleading statements and/or material omissions committed knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

106.   IBM and the Maker Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions as senior managers, the persons specified herein whose scienter can be imputed to IBM were responsible for the contents of IBM's statements. As senior managers of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to IBM's business, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of IBM securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning IBM's business and financial condition which were concealed, Plaintiff and the other members of the Class purchased or otherwise acquired IBM securities at artificially inflated

prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

107.    During the Class Period, IBM securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, that Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired IBM securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the artificially inflated prices they paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of IBM securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of IBM securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

108.    By reason of the conduct alleged herein, these Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

109.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented statements to the investing public.

## COUNT II

**VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(a) AND (c) PROMULGATED THEREUNDER AGAINST IBM AND THE INDIVIDUAL DEFENDANTS**

110.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

111.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC.

112.    In connection with the purchase and sale of securities, Defendants knowingly or recklessly engaged in a device, scheme, artifice to defraud, act, practice, and/or course of business conduct that operated as a fraud and deceit upon Plaintiff and the other members of the Class. Throughout the Class Period, the scheme: (i) deceived the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflated and maintained the market price of IBM securities; and (iii) caused Plaintiff and other members of the Class to purchase or otherwise acquire IBM securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

113.    Pursuant to the above device, scheme, artifice to defraud, act, practice, and/or courses of business conduct that Defendants employed and/or knew or recklessly disregarded would act as a fraud or deceit upon investors in IBM securities, each Defendant participated in directly or indirectly and/or were responsible for the device, scheme, artifice to defraud, act, practice, and/or course of business conduct that operated as a fraud or deceit on investors in IBM securities.

114.    IBM and senior managers mentioned herein whose scienter can be imputed to IBM and who are responsible for the device, scheme, artifice to defraud, act, practice, and/or course of business conduct had actual knowledge of the device, scheme, artifice to defraud, act, practice, and/or course of business conduct herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard of the device,

scheme, artifice to defraud, act, practice, and/or course of business conduct in that they failed or refused to ascertain and disclose such facts as would reveal the device, scheme, artifice to defraud, act, practice, and/or course of business conduct and its impact on the price of IBM securities. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as a direct result of the device, scheme, artifice to defraud, act, practice, and/or course of business conduct as described above.

115.    IBM and the Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the operations and content of the statements of IBM.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to IBM's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of IBM securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning IBM's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired IBM securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

116.    During the Class Period, IBM securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired IBM securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of IBM securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of IBM securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

117.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 (a) and (c) promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented statements to the investing public

## COUNT III

## VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

118.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

119.    During the Class Period, the Individual Defendants participated in the operation and management of IBM, and conducted and participated, directly and indirectly, in the conduct of IBM's business affairs.  Because of their senior positions, they knew the adverse non-public information about IBM's statements described above.

120.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to IBM's financial condition and results of operations, and to correct promptly any public statements issued by IBM which had become materially false or misleading.

121.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which IBM disseminated in the marketplace during the Class Period concerning IBM's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause IBM to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of IBM within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of IBM securities.

122.    Each of the Individual Defendants, therefore, acted as a controlling person of IBM. By reason of their senior management positions and/or being directors of IBM, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, IBM to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of IBM and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

123.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by IBM.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 13, 2023                         Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: 215-600-2817
Fax: 212-202-3827
jgoldberg@rosenlegal.com

James M. Evangelista
Stuart J. Guber (*pro hac vice forthcoming*)
**EVANGELISTA WORLEY LLC**
500 Sugar Mill Road, Ste. 245A
Atlanta, GA 30350
Tel: 404.205.8400
Fax: 404.205.8395
jim@ewlawllc.com
stuart@ewlawllc.com

*Attorneys for Plaintiff*